# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

JENNIFER T. MOTT,

                  Plaintiff,

     v.                                      Case No. 09-CV-784

MICHAEL J. ASTRUE, Commissioner of Social Security,

                  Defendant.

_____

# ORDER

On June 27, 2005, plaintiff Jennifer T. Mott ("Mott") filed an application for a period of disability and disability insurance benefits ("DIB") with the Social Security Administration, alleging a disability stemming from obesity, gout, asthma, and depression arising on June 15, 2005.   After her initial application was denied, Mott filed for a hearing before an Administrative Law Judge ("ALJ").   A hearing occurred on October 22, 2008, where Mott and an impartial vocational expert testified.   On March 9, 2009, the ALJ concluded that Mott was ineligible for DIB.   Subsequently, the Appeals Council of the Social Security Administration denied review, rendering the ALJ's decision final.   As a consequence, Mott filed this action for judicial review of the Commissioner of Social Security's decision denying the plaintiff's application for DIB.   The court begins by reviewing the factual and procedural background that precipitated this litigation based on the record that was presented to the ALJ.

# BACKGROUND

Ms. Mott is a twenty-nine year old female who resides in Milwaukee, Wisconsin. She has three children, who live with her and that she primarily raises. Previous to her alleged disability arising in June of 2005, the plaintiff had minimal work experience, most recently being employed as a cashier at K-Mart for two months in the spring of 2002. Ms. Mott also worked at various fast-food restaurants as a cashier from 1999 to 2000. The plaintiff also volunteered in the past at the Red Cross. The claimant has a limited educational background, having completed the 11th grade.[1] Ms. Mott has attended classes to obtain her General Educational Diploma ("GED").

On June 27, 2005, the plaintiff filed an application for DIB, alleging that both physical and mental impairments qualify her for such benefits. The ALJ, who reviewed the denial of the claimant's application for DIB, was presented with the following information about Ms. Mott's ailments.

## A.      Physical Impairments

### 1.      Gout

The first impairment Ms. Mott complains of is gout. The claimant was diagnosed with gout at the age of nine, but it appears that her joint pain intensified in the early summer of 2005, precipitating her alleged disability. On June 13, 2005, after complaining of pain, the plaintiff underwent diagnostic testing at the Sethi

---

[1] Moreover, the record indicates that Ms. Mott has a full scale intelligent quotient of 82, placing her in a "low average" intelligence classification. (Tr. 348).

Medical Clinic in Milwaukee. Testing revealed that Ms. Mott had elevated uric acid levels. (Tr. 241). On June 22, 2005, Dr. M. A. Razzaq ("Razzaq"), the claimant's treating physician, prescribed the plaintiff Indomethacin, a medicine intended to combat hyperuricemia. The plaintiff claims that the medicine causes her some drowsiness. After Ms. Mott began her treatment, her uric acid levels decreased to near normal levels. (Tr. 251). Morever, evaluations performed by disability examiners in the fall of 2006 found that the plaintiff has no postural or manipulative limitations and could frequently lift ten pounds, sit for six hours out of an eight-hour work day, and walk for two hours out of an eight-hour work day. (Tr. 167-73). In the years since her initial treatment for gout, Ms. Mott has occasionally complained of ankle, neck, and finger pain and swelling, but the record is unclear as to the severity of this pain and whether these complaints are directly attributable to her gout. Moreover, all of the tests performed on the plaintiff with respect to her joint infirmities have regularly resulted in "negative" readings for various ailments. (Tr. 387-409).

### 2. Obesity

The record indicates that in 2005, Ms. Mott, who is 5' 6" tall, weighed around 230 pounds. (Tr. 136). She has been counseled by physicians regarding nutrition and exercise. However, by October of 2008, the plaintiff had gained weight, weighing nearly 240 pounds. (Tr. 125). The record does not indicate to what extent Ms. Mott's obesity is the cause of her physical ailments.

-3-

### 3.    Asthma

The record contains the most detail about Ms. Mott's asthmatic condition.  The plaintiff has suffered from asthma since she was born.  Throughout the period in question, Ms. Mott was an "active smoker" (Tr. 209), regularly smoking at least two cigarettes a day.  (Tr. 206).  In January of 2005, Ms. Mott told a doctor that she smoked one pack of cigarettes every day for seven years.  (Tr. 261).  Moreover, the plaintiff takes several medications to combat her asthma, including Advair, an Albuterol inhaler, and Cingulair.  The medications have the side effect of causing some dizziness and drowsiness.

During the period in question, Ms. Mott met with several doctors, including a pulmonologist, to treat her asthma.[2]  The results of tests done during those examinations and the notes from the treating physicians universally indicate that Ms. Mott, while frequent to complain about her asthmatic condition, rarely showed any objective signs of debilitating asthma.  For example, in the winter of 2005, Dr. Nadeem Najam ("Najam") examined Ms. Mott, finding "mild occasional" wheezing. (Tr. 209).  In the weeks that followed, the plaintiff claimed she "consumed" fourteen inhalers to help combat her asthma, causing Dr. Razzaq, upon a January 5, 2006 examination, to refer Ms. Mott to Dr. Raed A. Hamed ("Hamed"), a pulmonary specialist.  Dr. Hamed, after performing various tests on Ms. Mott, found that "apart from [a] small airway disease, all other parameters [regarding her pulmonary

---

[2] In fact, between June 2006 and September 2008, doctors examined the plaintiff's lungs twenty six times.  (Tr. 334, 355-379, 381-385).

-4-

functioning] were . . . normal." (Tr. 205). In March of 2006, the plaintiff visited Dr. Hamed, complaining of shortness of breath related to changes in the weather. However, upon examination, the doctor concluded that Ms. Mott's readings were "perfectly normal," finding that the plaintiff had "moderate" asthma. (Tr. 235). An April 2006 check up with Dr. Razzaq also concluded that Ms. Mott's asthma was "relatively stable" and that her lungs were clear. (Tr. 386).

The pattern of Ms. Mott voicing complaints about severe asthma and her doctors concluding otherwise continued into the summer of 2006. The records from a checkup with Dr. Adedapo F. Okusanya ("Okusanya") in June of 2006 indicates that Ms. Mott was controlling her asthma with Advair and an albuterol inhaler, which eliminated any "nocturnal coughing" or "wheezing." (Tr. 383). Four months later, Ms. Mott visited Dr. Hamed again, complaining that she had been using her inhaler around ten times a day. Dr. Hamed found that Ms. Mott was experiencing "mild" decrease in breathing, but had no "crackles or wheezing." (Tr. 373). Dr. Hamed found that what difficulties the plaintiff was experiencing with breathing and pain were likely due a lack of exercise, Ms. Mott's continued smoking, and the plaintiff's "morbid obesity," factors her doctors found that the plaintiff could control. (Tr. 374-75). In January of 2007, Dr. Hamed again examined Ms. Mott in a routine follow-up procedure. The plaintiff told the doctor that she had the "occasional wheezing night," but denied any shortness of breath. (Tr. 370). The doctor found that Ms. Mott's asthma was "stable" and showed "no evidence of exacerbation." (Tr. 370). In April

Case 2:09-cv-00784-JPS   Filed 07/08/10   Page 5 of 32   Document 23

and December of 2007, Ms. Mott visited Dr. Razzaq complaining of an upper respiratory infection. However, both cases appeared to be temporary setbacks. The record does not indicate Ms. Mott had any other serious medical visits related to the treatment of her asthma, but during 2008 the plaintiff did visit the doctor to treat various temporary respiratory conditions, such as laryngitis and bronchitis.

### 4. Treating Physician's Conclusions About Ms. Mott

In April of 2006, Dr. Razzaq completed a "Medical Examination and Capacity" form, where he found that the plaintiff suffered from gout, asthma, obesity, osteoarthritis, depression, and post-traumatic stress disorder.[3] Despite far more optimistic notations in his findings during Ms. Mott's formal examinations,[4] Dr. Razzaq found that the plaintiff was severely limited in her ability to function, concluding on the form that Ms. Mott could "frequently" lift about five pounds, stand and walk for about one hour in an eight-hour workday, and sit for about an hour in an eight-hour work day. (Tr. 349). Moreover, Ms. Mott's physician noted that the plaintiff's medication caused her drowsiness and that the plaintiff had a "low tolerance for frustration." (Tr. 350). Ultimately, Dr. Razzaq recommended that the plaintiff participate in adult basic education classes and obtain Social Security disability advocacy.

---

[3] Dr. Razzaq's form also states that the plaintiff suffers from "HA." "HA" could stand for "headache" or "hepatitis A," but ultimately the record is unclear, and this court is not going to guess. The court notes that this should have been resolved by the plaintiff's attorney, but the plaintiff's attorney opted, instead of defining this term, to parrot what Dr. Razzaq listed on the form.

[4] For example, around the same time period he filled out the form in question, Dr. Razzaq found that the plaintiff's lungs were "clear" and that the plaintiff's asthma was "stable." (Tr. 386).

-6-

In April of 2007, following Ms. Mott's visit regarding an upper respiratory infection, Dr. Razzaq filled out another "Medical Examination and Capacity" form, finding that the plaintiff continued to suffer from the aforementioned diseases from April of 2006 with the addition of a headache and back pain. The doctor opined that Ms. Mott's physical capabilities were such that she could frequently lift and carry three pounds and could only sit or stand for a half an hour during an eight-hour work day. Dr. Razzaq made the same recommendation that the plaintiff participate in adult education classes and obtain Social Security disability advocacy. In October of 2007 and June of 2008, Dr. Razzaq completed similar forms which were identical assessments to the form the doctor filled out in April of 2007.

**B.    Mental Impairments**

Ms. Mott also alleges she is disabled because of various mental impairments, including depression. From July of 2005 to December of 2005, Dr. Paul West, Ph.D. ("West"), treated Ms. Mott for her mental impairments. Dr. West noted that the plaintiff had several traumatic experiences in her past that caused her anxiety and frustration. In November of 2005, Dr. West diagnosed Ms. Mott as suffering from "major depressive episodes" and recommended that the plaintiff take "adult basic education classes." (Tr. 192-93). Ms. Mott's doctor suggested that for a three month period the plaintiff should attend such classes for an hour every day per week. (Tr. 193). Notably, Dr. West did not conclude that Ms. Mott's depression warranted seeking advocacy for disability benefits. In late September of 2005, Dr. D. Evan

-7-

Bestland, Ph.D. ("Bestland") evaluated the plaintiff, diagnosing her with depression disorder and a nicotine dependence. Dr. Bestland assigned Ms. Mott a "General Assessment of Functioning" ("GAF") score ranging between 61 to 70, a sign of mild mental impairment. (Tr. 165). Dr. Bestland also noted that the plaintiff was "fairly active," as she regularly cooked, cleaned, completed household chores, attended medical appointments, studied for her GED classes, and dropped children off at day care. (Tr. 163). Ultimately, Dr. Bestland concluded that, at the time of his assessment, Ms. Mott was "more capable of participating in training" than "formal employment" because of her various "problems" and "responsibilities." (Tr. 165). Dr. Keith Bauer, Ph.D. ("Bauer") similarly concluded in a October 2005 evaluation of the plaintiff that she had a depressive disorder, that resulted in "mild" restriction on her daily living activities. (Tr. 184). Moreover, Dr. Bauer found that Ms. Mott would have "moderate" difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 184). Otherwise, Dr. Bauer concluded that the plaintiff was not significantly limited in seventeen out of twenty areas of work-related functioning. (Tr. 188-89).

Beginning in 2006, Ms. Mott was treated at the Ravenwood Clinic by Dr. Michael Ewing, M.D. ("Ewing") and Dr. Thomas Byrnes, Ph.D. ("Byrnes"). Dr. Byrnes' initial diagnosis concluded that the plaintiff was suffering from "major depression" and post-traumatic stress disorder. (Tr. 322). Dr. Byrnes assigned Ms. Mott a GAF score of 50 to 55, indicating that Ms. Mott was having moderate

Case 2:09-cv-00784-JPS   Filed 07/08/10   Page 8 of 32   Document 23

difficulties in functioning. Dr. Ewing examined the plaintiff in August of 2006, concurring with Dr. Byrnes' diagnosis that Ms. Mott was suffering from "major depression." (Tr. 329). Dr. Ewing concluded, however, that the plaintiff did not have a "full blown" case of post-traumatic stress disorder. (Tr. 329). Dr. Ewing prescribed Bupropion for Ms. Mott which, the plaintiff claimed in a later check up, improved her mental state. (Tr. 327). In February of 2007, Dr. Ewing found that many of Ms. Mott's anxieties were a product of her struggles to cope with parenting.[5] (Tr. 323). As such, Dr. Ewing urged the plaintiff to "get in to do some work with Dr. Byrnes" and focus her therapy "around the issues of parenting." (Tr. 323). Dr. Ewing found during his meetings with Ms. Mott that she was appropriately dressed and groomed and had normal speech, fair insight and judgment, intact cognitive functioning, and a full range of affect. (Tr. 329).

Ms. Mott had a few followup visits with Dr. Byrnes (Tr. 414-431), but ultimately missed several appointments. (Tr. 415, 418). In April of 2007, Dr. Byrnes completed a "Medical Examination and Capacity" form, which found that Ms. Mott was suffering from "major" depression and somatic illnesses. (Tr. 351). Dr. Byrnes also noted that Ms. Mott had "low tolerance for frustration," "difficulty controlling anger," and made "socially inappropriate responses to situations." (Tr. 352). Ultimately, Dr. Byrnes did not conclude that Ms. Mott need disability advocacy, but instead recommended that she continue with her home schooling. In November of

---

[5] Ms. Mott contends that her children, who, like the plaintiff, have several health problems, are a cause for her mental impairments.

2007, Dr. Byrnes saw Ms. Mott for the last time, noting that she was "euthymic" and "congruent" in her mood. (Tr. 421). In January of 2008, Dr. Byrnes discharged the plaintiff, as she had "not sought [an] appointment after extended periods of inactivity." (Tr. 320). During her treatment for her depression, Ms. Mott has been prescribed several anti-depressants, including Fluoxetine, which she claims has the side effects of making her tired and weak.

## C.    The Hearing

On October 22, 2008, in Milwaukee, Wisconsin, the claimant and her attorney attending a hearing before an ALJ who evaluated Ms. Mott's claim for DIB. At the hearing, the ALJ discovered that the plaintiff had recently moved, requiring the plaintiff to "pack up the stuff" and "tape up" boxes. (Tr. 436). Ms. Mott also noted that she arrived at the hearing after waiting for the bus, sitting on the bus for forty minutes, and standing outside the hearing room for another hour. (Tr. 437). The ALJ noted that this would appear to be a "medical miracle," given that Ms. Mott was asserting that she could not sit or stand for longer than a half an hour. (Tr. 438). The plaintiff conceded she was doing little to combat her obesity, even admitting that she was eating some M&M brand candies before the hearing. (Tr. 438). Ms. Mott informed the ALJ that she was studying at home for her GED. (Tr. 443). Moreover, the claimant and her attorney repeatedly complained about the assessments of Dr. Razzaq, noting he would not "add anything new" to his notes after examining Ms. Mott. (Tr. 448, 450-51). Ms. Mott also alleged that she was "no longer smoking," but

-10-

admitted to "bum[ming] a cigarette here and there." (Tr. 445). The plaintiff asserted that she was continuing to have trouble breathing, using her inhaler and a nebulizer at night to alleviate her breathing problems. Ms. Mott complained that she still had pain related to gout, but conceded that she was not taking Indocin to combat her joint pain. (Tr. 452). Moreover, the plaintiff repeated her claims that she was frequently dizzy and exhausted, causing her difficulty with sleeping.

The court also heard from a vocational expert ("VE"). The ALJ provided the VE with a hypothetical of a "person of the age, education and work experience of the claimant" who had "no work history," was "limited to unskilled sedentary work," had to "avoid pulmonary irritants such as fumes, cigarettes," and would be "off task five percent of the time and would miss one day per month," and asked if there were "any jobs such an individual could perform." (Tr. 459). The VE testified in response to the ALJ's inquiry that there were "approximately 2,000 [assembly] jobs," 1,500 "general production" jobs, and 1,000 "packing and hand packaging" jobs in the State of Wisconsin for an individual fitting the parameters of the hypothetical worker. (Tr. 459). When asked if there would be any jobs if the worker was "absent from work two to three days per month," the VE testified that no jobs would exist, as such absences would be "in excess of what competitive employers would allow." (Tr. 459).

Case 2:09-cv-00784-JPS   Filed 07/08/10   Page 11 of 32   Document 23

**D. Post-Hearing Evaluations**

At the hearing, the ALJ stated that, based on the inconclusive evaluations of Ms. Mott's doctors, additional physical and mental examinations were needed. As a result, on November 24, 2008, Dr. Abdul Hafeez, M.D. ("Hafeez") examined the plaintiff. Dr. Hafeez made three conclusions based on his examination of the plaintiff. First, the doctor found that while Ms. Mott had "significant symptoms of asthma," her air entry was "good," she had no "wheezes or crackles," and she did not exhibit any broncospasms during the examination. (Tr. 302-303). Second, the doctor found that Ms. Mott was obese and deconditioned, which added to her breathing problems. (Tr. 303). Finally, Dr. Hafeez was unsure if the plaintiff had any gout and could not conclude that Ms. Mott's pains were attributable to the medical condition. Dr. Hafeez did not see any deformities in Ms. Mott's joints. After his examination of the claimant, Dr. Hafeez filled out a "Medical Source Statement of Ability to Do Work-Related Activities" form, where he concluded that the plaintiff could "continuously" lift and carry up to ten pounds and "frequently" lift and carry from eleven to twenty pounds. (Tr. 304). Dr. Hafeez also concluded that the plaintiff could sit for five hours and stand for two hours in an eight-hour work day, but noted that asthma would limit Ms. Mott's physical activity. (Tr. 305). The doctor also found that Ms. Mott could "frequently" use her feet and hands to perform an array of activities. (Tr. 306). Dr. Hafeez did find that Ms. Mott would be restricted from

-12-

working at unprotected heights, around dust, odors, flames, and other irritants, and in extreme temperature conditions. (Tr. 308).

Ms. Mott was also evaluated by Dr. Timothy C. Wiedel, Ph.D. ("Wiedel") for a mental status examination and Minnesota Multiphasic Personality Inventory ("MMPI").[6] Dr. Wiedel concluded that Ms. Mott did have a history of depression, but did not suffer from Post-Traumatic Stress Disorder. Moreover, Dr. Wiedel found that the plaintiff was "reasonably stable," as Ms. Mott did not "show severe affective or behavioral disturbance." (Tr. 314). While the doctor found that Ms. Mott was experiencing frustration with her life, Dr. Wiedel ultimately concluded that Ms. Mott did not have "substantial mental illness" and may "very well be exaggerating symptoms." (Tr. 314).

The two additional evaluations by Dr. Hafeez and Dr. Wiedel completed the record in this case. On March 9, 2009, the ALJ submitted a decision adverse to Mott's claim. The court now examines that determination in this appeal.[7]

## DISCUSSION

When reviewing a Social Security benefits determination, the court must uphold the Commissioner's decision if it is supported by substantial evidence and no error of law occurred. 42 U.S.C. § 405(g); *Dixon v. Massanari*, 270 F.3d 1171,

---

[6] Dr. Wiedel did have difficulties administering the MMPI test to Ms. Mott, as he thought she was "engaging in random responding, had difficulty with reading ability, or was malingering." (Tr. 313).

[7] The court notes that the plaintiff's attorney never opted to file a reply brief in this case. As such, the court only has the benefit of the plaintiff's brief in support and the Commissioner's response brief.

-13-

1176 (7th Cir. 2001). "Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 401, 28 L. Ed. 2d 842, 91 S. Ct. 1420 (1971); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). A reviewing court may not reevaluate facts, re-weigh the evidence, or substitute its own judgment for that of the agency. *Walker v. Bowen*, 834 F.2d 635, 643-44 (7th Cir. 1987). Moreover, "where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility" for the decision falls on the ALJ, not on the district court. *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993). The standard of review for an agency's evaluation of facts is a generous one, but not wholly uncritical; only where the agency's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, must the case be remanded. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The reasons given by an ALJ must build an "accurate and logical bridge" between the evidence and the result. *Id.* at 941. However, "conclusions of law are not entitled to deference"; if the ALJ commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997).

To qualify for disability benefits under the Social Security Act, a claimant must be "disabled" – that is, unable to "engage in substantial gainful activity by reason of of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

Case 2:09-cv-00784-JPS   Filed 07/08/10   Page 14 of 32   Document 23

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations, in turn, create a five-step, sequential test for determining whether a claimant is disabled. *See Briscoe v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005). Under this test, the ALJ must address the following questions: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Do the impairments meet or exceed any of the specific impairments the Secretary acknowledges to be presumptively disabling? (4) Have the claimant's impairments limited his or her remaining or "residual functional capacity" ("RFC") so that he or she is no longer able to perform the demands and duties of a former occupation? (5) Is the claimant unable to perform any other work in the national economy given his or her age, education, and work experience? *Wolfe v. Shalala,* 997 F.2d 321, 322-23 (7th Cir. 1993). The claimant bears the burden of proof for steps one through four, with the burden shifting to the agency at the fifth step. *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004). A negative conclusion by the ALJ at any step, excluding step three, precludes a finding of a disability per the Social Security Act. *Id.*

The court begins by reviewing the decision of the ALJ. In this case, under step one, the ALJ found that the claimant had "never engaged in substantial gainful activity," and was, therefore, presently unemployed. (Tr. 15). Proceeding to question two, the ALJ concluded that Ms. Mott had the following "severe" impairments: asthma, gout, obesity, and depression. (Tr. 15). At the third step, the ALJ concluded that the plaintiff did not have an impairment that met or medically

-15-

equaled one of the listed impairments in the Social Security Regulations as to be "so severe" as to preclude substantial gainful activity. (Tr. 15-16). At step four, the ALJ found that the claimant had a RFC to perform "sedentary work as defined in 20 C.F.R. § 416.967(a)[8] with additional limitations to unskilled work in an environment with no pulmonary irritants, be off task approximately 5% of the time, and be chronically absent one day per month." (Tr. 16). However, because the claimant had no past relevant work, the ALJ proceeded to step five, where he found that, considering Ms. Mott's age, education, work experience, and RFC, there were jobs that exist in "significant numbers in the national economy that the claimant can perform." (Tr. 20). Accordingly, the ALJ found that the plaintiff was not entitled to DIB.

Ms. Mott disputes the ALJ's determination and alleges that he committed several errors in reaching his conclusions at step four. Specifically, the claimant alleges that the ALJ erred: (1) in his determination of the RFC; (2) in his evaluation of the opinions of Ms. Mott's treating physicians; and (3) in assessing Ms. Mott's credibility. The court begins by evaluating the plaintiff's argument with respect to the ALJ's evaluation of Ms. Mott's RFC.

_____

[8] 20 C.F.R. § 416.967(a) defines sedentary work as work as the following:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

-16-

**A.     The ALJ's Determination of the RFC**

A claimant's RFC is "the most the claimant can still do despite [his or] her limitations," and the "ALJ determines a claimant's RFC based on . . . all the relevant evidence in the record."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009).  In crafting an individual's RFC, the ALJ "must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling."  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (quoting S.S.R. 96-8p).  Mott raises a number of problems with the ALJ's RFC determination.

Mott first argues that the ALJ's RFC determination was flawed because the ALJ did not "identify either the exertional or non-exertional demands of sedentary work," such as "strength limitations" or "how well the Plaintiff could sit." (Pl.'s Br. 9). However, the record is clear that the ALJ did state that the claimant had an RFC to perform sedentary work as defined by 20 C.F.R. § 416.967(a), which, in turn, properly identifies the different physical demands of sedentary work.  The plaintiff cites to no authority that anything more from the ALJ is needed, and the court finds no reason to take issue with the ALJ's approach.

Next, Mott argues that substantial evidence does not support the ALJ's conclusion that the plaintiff could perform sedentary work.  The court disagrees.  The ALJ concluded that Ms. Mott could perform sedentary work based on:  (1) the daily activities of the plaintiff, including her ability to "take a bus to the hearing" and "sit for

Case 2:09-cv-00784-JPS   Filed 07/08/10   Page 17 of 32   Document 23

over an hour [during the hearing] in apparent comfort" (Tr. 16); (2) her demonstrated ability to take care of her three children; (3) substantial evidence from medical examinations, such as the one done by Dr. Hafeez, that concluded that Ms. Mott could lift twenty pounds frequently and sit for five hours out of an eight-hour day; and (4) substantial evidence from medical examinations that concluded that Ms. Mott's physical ailments, including asthma, obesity, and gout, could be controlled through medicine, exercise, and diet. Upon examining the record, the court finds that the reasons proffered by the ALJ are supported by substantial evidence in the record, and the court does not find error in the ALJ's approach.

The plaintiff contends that the ALJ ignored evidence that the defendant had stopped going to GED classes, which, according to the claimant, shows that she was unable to perform sedentary work. The court is unclear as to why the fact that Ms. Mott opted to not attend her GED classes is objective evidence that she cannot perform sedentary work. More importantly, the mere existence of some evidence contrary to the ALJ's decision does not render the evidence on which the ALJ relied insubstantial. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). The ALJ need not provide a written evaluation of every piece of evidence, but need only "minimally articulate" his reasoning so as to connect the evidence to his conclusions. *Rice*, 384

-18-

F.3d at 371. Here, the ALJ, aided by the appropriate evidence, has adequately articulated his conclusion that Ms. Mott can perform sedentary work.[9]

Ms. Mott also attacks the RFC used by the ALJ by arguing that the hearing officer found that the plaintiff could perform sedentary work with *no* pulmonary irritants, whereas the hypothetical posed to the VE at the hearing was in regards to a person who *avoided* pulmonary irritants. The plaintiff is attempting to make an issue out of the ALJ's phrasing, but for purposes of determining the RFC, there is no difference between working in an environment with "no" irritants and working in an environment where irritants would be "avoided." *See Random House Dictionary*, Avoid- 4 dictionary results, http://dictionary.reference.com/browse/avoid (defining "avoid" as "to keep away from; keep clear of; shun," "to prevent from happening," "to make void or of no effect") (last visited June 30, 2010). The plaintiff's argument is purely semantical in nature and "amounts to nothing more than a dislike of the ALJ's phraseology." *Rice,* 384 F.3d at 369. The plaintiff does not cite to any authority that working in an environment where there are "no" pulmonary irritants is any different than working in an environment where pulmonary irritants are "avoided."[10] The court finds that the ALJ's RFC appropriately accounted for the plaintiff's aversion to

_____

[9] The claimant also asserts that the ALJ ignored evidence that Ms. Mott took medicine that caused her drowsiness. However, the ALJ discussed his evaluation of Ms. Mott's fatigue symptoms, explaining that the plaintiff's obesity, deconditioning, and smoking was the source of her fatigue. (Tr. 16). Accordingly, the ALJ provided a logical path between the evidence and his conclusions regarding Ms. Mott's fatigue.

[10] Indeed, the ALJ may have been generous in allowing for a work environment where Ms. Mott could "avoid" irritants, as Ms. Mott, who by her own admission continues to smoke, does not "avoid" what her own doctors found to be a cause of her breathing problems.

-19-

pulmonary irritants, as the court should not nitpick at the ALJ's chosen phrasing of his hypothetical to the VE. *Id* (explaining that when reviewing an ALJ's decision, the court should "give the opinion a commonsensical reading rather than nitpicking at it.")[11]

The plaintiff also argues that the ALJ erred in determining the RFC by finding that Ms. Mott's mental impairments did not limit her ability to perform substantial gainful activity. (Pl.'s Br. 11). First, Ms. Mott argues that the ALJ erred by not including in his RFC assessment or in a hypothetical to the VE that the plaintiff was limited to low stress work. However, the RFC limited the claimant to "unskilled work," allowed Ms. Mott to be "off task" approximately five percent of the time, and permitted the plaintiff to be chronically absent one day per month. (Tr. 16). The plaintiff provides no reason why a job involving unskilled work where regular absences are expected and where someone can be "off task for five percent of the workday" could be deemed "stressful." The court finds that, while the ALJ did not use the words "low stress" with respect to the RFC, the RFC crafted by the ALJ sufficiently restricts Ms. Mott to jobs that are low stress in nature. Moreover, the ALJ did find that Ms. Mott could tolerate some stress, as evidenced by the responsibilities

---

[11] The plaintiff poses the fact that the ALJ did not directly discuss: (1) Ms. Mott failure to attend GED classes; (2) the difference between "avoiding" and having "no" pulmonary irritants; and (3) Ms. Mott's drowsiness from her medicine as "errors of law" requiring remand. However, the plaintiff's gripes with the ALJ's methodology are not with regard to an interpretation of a law or a regulation, but with respect to how the ALJ resolved factual questions. As such, the substantial evidence standard is the correct standard to evaluate the issues raised by the plaintiff. *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006) ("Although we perform a *de novo* review of the ALJ's conclusions of law, our review of the ALJ's factual determinations is deferential.")

-20-

that she fulfilled in raising her children, indicating that no further limitation regarding stress was needed with respect to the RFC. (Tr. 19).

In a similar vein, the plaintiff argues that the ALJ failed to incorporate the plaintiff's "moderate difficulties with social functioning . . . and . . . in concentration, persistence, and pace" into the RFC assessment. (Pl.'s Br. 11). As discussed above, the ALJ did discuss in his decision Ms. Mott's moderate mental difficulties. While the ALJ found that Ms. Mott would have some problems in the workplace, the ALJ, relying on the findings of Dr. Wiedel and Dr. Bestland, concluded that Ms. Mott's difficulties were "not disabling." (Tr. 19). Accordingly, the ALJ's proposed RFC that allotted time in which the claimant could be "off task" adequately accounted for Ms. Mott's impairments.[12]

Finally, the plaintiff argues that the ALJ erred in his assessment of the claimant's RFC by not presenting the VE with a hypothetical based on the limitations provided by Dr. Bauer, a doctor from the Wisconsin Disability Determination Bureau. (Pl.'s Br. 12). Under the Social Security Administration's regulations, state agency medical and psychological consultants like Dr. Bauer are deemed "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p. While the ALJ is not bound by

---

[12] The plaintiff contends that the ALJ ignored Dr. Wiedel's findings that Ms. Mott would have problems with "work pace, getting confused at times." (Pl's Br. 11). The court finds that the ALJ incorporated these issues into his RFC by limiting the amount of time the claimant would have to be on task. The "ALJ need not mention every strand of evidence in [his] decision but only enough to build an 'accurate and logical bridge' from evidence to conclusion." *Simila,* 573 F.3d at 517.

-21-

findings made by state agency physicians and psychologists, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions." *Id.* Here, the ALJ did not discuss Dr. Bauer's opinion in the decision and, therefore, the ALJ committed an error. However, the issue that remains for this court is whether the ALJ's error requires a remand.

Dr. Bauer's findings are nearly identical to that of Dr. Wiedel and Dr. Bestland, whose opinions the ALJ discussed in detail. Dr. Bauer found that: (1) Ms. Mott's depressive disorder only placed a "mild" restriction on her life (Tr. 184); (2) the claimant had "moderate" difficulties in maintaining social functioning, concentration, persistence, or pace (Tr. 184); and (3) Ms. Mott was not significantly limited in seventeen out of twenty areas of work-related functioning. (Tr. 188-89). Here, there is no reason to conclude that if the ALJ directly discussed the findings of Dr. Bauer that the hearing officer would have made a different determination with regard to the claimant's RFC. As discussed above, the ALJ accounted for the claimant's moderate difficulties in maintaining social functioning and concentration, persistence or pace by incorporating appropriate limitations into the RFC. "No principle of administrative law or common sense requires [this court] to remand a case in [a] quest for the perfect opinion unless there is reason to believe that remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). Here, the court can conclude that the ALJ's error does not warrant a remand. The court

-22-

proceeds to evaluate the errors the plaintiff alleges occurred with regard to the ALJ's evaluation of the opinions of Ms. Mott's treating physicians.

## B.    The ALJ's Evaluation of the Treating Physicians' Opinions

The Social Security regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met:  (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques"; and (2) it is "not inconsistent" with substantial evidence in the record.  *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (quoting 20 C.F.R. § 404.1527(d)(2)).  Ultimately, if the ALJ rejects the opinion of a treating source, the ALJ "must give a good reason."  *Id.*  Moreover, "[t]he ALJ is not required to give controlling weight to the ultimate conclusion of disability – a finding specifically reserved for the Commissioner."  *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010).

Ms. Mott first contends that the ALJ committed error by not giving controlling weight to Dr. Razzaq's opinion that the plaintiff could not perform sedentary work. (Pl's Br. 12).  However, the court is convinced that the ALJ did not commit error in rejecting Dr. Razzaq's opinion.  The ALJ not only provided "a good reason" to reject the treating physician's opinion, *Schaaf,* 602 F.3d at 875, he gave at least six, including:  (1) countless treatment notes from Dr. Razzaq indicating his opinion that the claimant's ailments were moderate in nature; (2) numerous tests, such as MRIs

Case 2:09-cv-00784-JPS   Filed 07/08/10   Page 23 of 32   Document 23

and x-rays, that all failed to show any significant abnormalities with the claimant;[13] (3) the plaintiff's ability to travel to and attend the hearing without any noticeable discomfort; (4) the plaintiff's lifestyle and her ability to care for three small children; (5) the doctor's unwillingness to provide a course of treatment that was consistent with his assessment that the claimant was a severely disabled person; and (6) the fact that Dr. Razzaq's opinion was diametrically opposed to those of Dr. Hafeez, Dr. Hamed, and Dr. Okusanya. (Tr. 17-18). Moreover, while not stated explicitly in the ALJ's decision, the transcript of the hearing in this case indicates that the ALJ was persuaded by the plaintiff's own contention that Dr. Razzaq was sloppy in his evaluation of the claimant. (Tr. 448, 450-51). Finally, the forms in which Dr. Razzaq made his conclusions regarding Ms. Mott's ability to do sedentary work do not indicate the basis for the doctor's conclusions. (Tr. 349-354). In short, Dr. Razzaq's assertions on the "Medical Examination and Capacity" forms he completed in 2006 and 2007 were not based on objective evidence and were contradicted by substantial evidence in the record, and, as such, the ALJ was justified in not giving Dr. Razzaq's opinion controlling weight.

The plaintiff has several issues with the ALJ's conclusions about Dr. Razzaq's findings. First, Ms. Mott complains that the ALJ did not identify all of the treatment notes that were inconsistent with Dr. Razzaq's conclusions regarding the plaintiff's

---

[13] Specifically, tests repeatedly found that Ms. Mott's lungs were "clear" and "normal." (Tr. 204, 355-59, 360, 371, 376-77). Moreover, tests showed that Ms. Mott, when she treated her gout with the appropriate medicine, reduced the uric acid levels in her body to near normal levels. (Tr. 251-52).

-24-

ability to perform sedentary work. However, the ALJ did note several of the doctor's treatment notes, such as his finding that the plaintiff's asthma was controlled through medication. (Tr. 17). The ALJ does not need to parrot the entirety of Dr. Razzaq's treatment notes; the ALJ only needs to "minimally articulate" his reasons for discounting the treating physician's opinion, a standard that the Seventh Circuit has described as "very deferential" and "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

Second, the plaintiff takes issue with the ALJ finding that the plaintiff's ability to take a forty minute bus ride and wait for and attend the hearing was evidence against Dr. Razzaq's findings. While the so-called "sit and squirm" test has been questioned by the Seventh Circuit, *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000), the Court of Appeals has also hardily endorsed the role of observation by the ALJ when determining credibility. *Id, see also Oakes v. Astrue*, 258 Fed. Appx. 38, 43 (7th Cir. 2007). Here, the ALJ did not base his decision entirely on the demeanor of the plaintiff during the hearing. The ALJ merely found that the witness showed no signs of pain at the hearing, and this was one factor that contributed to the hearing officer's credibility determination. Moreover, the ALJ reasonably found it remarkable that a claimant, who was asserting that she could not sit or stand for any extended period of time, had just taken an extended bus trip to attend the hearing. Without reason to think that the ALJ's judgment regarding the plaintiff's

Case 2:09-cv-00784-JPS   Filed 07/08/10   Page 25 of 32   Document 23

credibility was "patently wrong," *Powers,* 207 F.3d at 436, this court cannot find error in the ALJ's finding.

The plaintiff also argues that the ALJ erred by rejecting "the opinions of several of [the] plaintiff's treating psychologists and psychiatrists" (Pl.'s Br. 13), including Dr. Byrne and Dr. Ewing.[14]  The ALJ rejected Ms. Mott's doctors' initial[15] diagnoses that the plaintiff was suffering from "major" depression and was having "moderate" difficulties in functioning, such as socially inappropriate responses to frustration, because:  (1) her lifestyle, including caring for young children and occasionally attending GED classes, indicated she is not severely impaired; (2) the evidence of Dr. Wiedel, who found, after examining Ms. Mott, that she did not have substantial mental illness and may be exaggerating her symptoms; (3) the findings of Dr. Bestland who found that Ms. Mott was engaged in an "active" lifestyle and was, at best, mildly impaired; and (4) the lack of evidence within the record supporting Dr. Byrnes' and Dr. Ewing's initial conclusions.  (Tr. 17-19).

The court finds the ALJ did not err by refusing to assign "controlling weight" to the opinions of Ms. Mott's former treating psychologist and psychiatrists.  First, all of Dr. Byrnes' and Dr. Ewing's conclusions were based on Ms. Mott's own assertions, evidence that prevents the ALJ from giving considerable weight to those

---

[14] The record is unclear as to whether Dr. Ewing was a treating source, and neither side makes an argument either way.  As his status as a treating source will not alter the court's conclusions, the court proceeds under the assumption that Dr. Ewing was a treating source.

[15] The court note that Dr. Byrnes later found that Ms. Mott was "euthymic" and "congruent" in her mood.  (Tr. 421).

-26-

doctors' findings. "Subjective complaints are the opposite of objective medical evidence" and cannot form the basis of an opinion that is supported by "medically acceptable clinical diagnostic techniques," the first prong of the test a treating physician's opinion must satisfy to be given controlling weight. *Schaaf,* 602 F.3d at 875. Second, substantial evidence contradicts the initial findings of Dr. Byrnes and Dr. Ewing. For example, Dr. Byrnes' later observations indicated that Ms. Mott was not suffering from severe mental ailments. (Tr. 421). The findings of Dr. Wiedel and Dr. Bestland also called into question the entirety of Ms. Mott's doctors' conclusions.[16] As such, the court cannot find error with the ALJ refusing to assign considerable weight to Dr. Byrnes' and Dr. Ewing's opinions.[17]

## C. The ALJ's Credibility Determination

Finally, the plaintiff contends that the "ALJ did not properly evaluate [Ms. Mott's] credibility." (Pl.'s Br. 14). In this case, the ALJ stated that he found "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," but "the claimant's statements concerning the

---

[16] Notably, Dr. Wiedel's conclusion that Ms. Mott may be malingering casts doubt on the entire basis for Dr. Byrnes' and Dr. Ewing's diagnoses. The plaintiff makes much of the fact that Dr. Wiedel did not guarantee that Ms. Mott was malingering. However, the fact that Dr. Wiedel found that Ms. Mott had the potential to exaggerate her symptoms provides evidence against the findings of her treating sources.

[17] The plaintiff also contends that the ALJ misquoted Dr. Bestland's opinion. The court disagrees. The ALJ found that Dr. Bestland's opinion that Ms. Mott would "benefit" from a job training program rather than formal employment was a product of Ms. Mott's life situation (i.e., having three small children) as opposed to her disability. (Tr. 19). The ALJ's reading of Dr. Bestland's opinion concurs with the record. (Tr. 165) ("She is viewed as more capable of participating in training rather than formal employment because of the various *problems and responsibilities she has*) (emphasis added). The ALJ's assessment of Dr. Bestland's statement is not a "mischaracterization" and is most definitely not a reason to remand the case.

intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" RFC. (Tr. 16). In evaluating the credibility of Ms. Mott's statements about her impairments and their effect on her ability to work, the ALJ must consider all of the evidence in the record, including medical signs and laboratory findings, opinions provided by treating and examining physicians and psychologists, and statements or reports by Ms. Mott and those who treated or examined her about her medical history, treatment, work history, daily activities, and ability to work. *See* SSR 96-7p. A reviewing court may reverse an ALJ's credibility determination only if it is so lacking in explanation or support that it is "patently wrong." *Simila*, 573 F.3d at 517.

Here, the plaintiff provides a random assortment of complaints that she has with the ALJ's assessment of her credibility.[18] First, the plaintiff argues that the ALJ erred by finding that the claimant's asthma was not a disabling condition because the ailment could be controlled with medication. (Pl's Br. 15). However, there is substantial evidence within the record to support the ALJ's conclusions regarding the extent of Ms. Mott's asthma. Nearly all of the medical tests that examined Ms. Mott's breathing concluded that her lungs were clear and that the plaintiff was breathing normal. (Tr. 334, 355-79, 381-85). Moreover, the only evidence that the plaintiff

---

[18] In fact, the court is unclear if the plaintiff's arguments are even relevant to the credibility determination, as the final pages of the plaintiff's brief seem to explode with a host of undeveloped and unrelated arguments. The court will attempt to resolve Ms. Mott's claims regarding the ALJ's credibility determination, but reminds the plaintiff that "inadequately developed arguments are deemed waived" by this court. *Girl Scouts of Manitou Council Inc. v. Girl Scouts of U.S. of America Inc.*, No. 08-CV-0184, 2010 U.S. Dist. LEXIS 32501, 2010 WL 1241275, at *140 (E.D.Wis. March 31, 2010).

was having debilitating issues with her breathing came from the assertions of Ms. Mott herself, testimony that the ALJ found to be contradicted by all objective evidence. Unable to find the ALJ's conclusions patently wrong, the court will not reverse the ALJ's credibility determination. *Simila*, 573 F.3d at 517.

Second, the plaintiff contends that there was no basis for the ALJ's assessment that the plaintiff's asthma could be controlled if she did not smoke. (Pl's Br. 15). However, the ALJ's opinion is well-supported by evidence in the record of the plaintiff's doctors telling her that her breathing problems were in part related to Ms. Mott's continued choice to smoke. (Tr. 218, 374). More importantly, unlike in *Scramek v. Apfel,* 226 F.3d 809, 813 (7th Cir. 2000), a case cited by the plaintiff, here, the ALJ did not base his *credibility determination* on the fact that the claimant continued to smoke. Rather, the ALJ made a passing comment about the plaintiff's smoking habit, noting that the plaintiff's asthmatic condition is not disabling and would be even less bothersome if the plaintiff opted to not smoke. In short, the ALJ's comments about smoking do warrant reversing his decision.

Third, the plaintiff contends, within the section of her brief devoted to the question of the ALJ's credibility determination, that the ALJ did not explain what limitations were imposed by the plaintiff's obesity and deconditioned state. (Pl.'s Br. 15). Again, the court is unclear as to why the plaintiff's argument is one that questions the ALJ's credibility determination. Moreover, there was no real dispute as to the evidence in this case: Ms. Mott's obesity and deconditioning mildly limited

-29-

her movements and did not prevent Ms. Mott from engaging in an active lifestyle. (Tr. 302). "[A]n ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence." *Zatz v. Astrue*, 346 Fed. Appx. 107, 111 (7th Cir. 2009). The court is satisfied that the ALJ, by limiting Ms. Mott's RFC to sedentary work with periodic breaks, accounted for her obesity and deconditioning. (Tr. 18). Moreover, the court notes that significant evidence within the record indicated that the plaintiff was ignoring her doctor's prescribed treatment and doing little to try to combat her obesity, such as exercising or dieting. In fact, Ms. Mott even admitted to snacking on M&M candies immediately before the hearing. (Tr. 438). Failure to follow prescribed treatment is reason to not find a claimant disabled. *See* 15 C.F.R. § 404.1530.

Next, the claimant argues that the ALJ failed to discuss how the "side effects from medications would affected [sic] her credibility." (Tr. 15). However, an ALJ is "not required to provide a complete written evaluation of each piece of evidence . . . including the side effects of medication." *Labonne v. Astrue*, 341 Fed. Appx. 220, 226 (7th Cir. 2009). While the record indicates that Ms. Mott complained that her medications caused her some drowsiness, there is nothing in the record to conclude that the medications caused any sort of significant impairment that warranted specific discussion in the ALJ's decision. *Id.*

Finally, the plaintiff argues that the ALJ's credibility determination is flawed because the hearing officer inappropriately ignored evidence that Ms. Mott was

-30-

experiencing stress and exhaustion stemming from taking care of her children. (Pl.'s Br. 15-16). However, the ALJ did not ignore such evidence: he appropriately accounted for the stress of Ms. Mott's family life by assigning an RFC that was limited to unskilled work with periodic moments where the claimant could be "off task." (Tr. 19). Moreover, as discussed earlier in this order, the ALJ supported his conclusions about the extent of Ms. Mott's mental impairments with substantial evidence, such as the findings of several doctors who found the plaintiff to be mildly or, at best, moderately impaired by her depression. Additionally, the plaintiff ignores the ALJ's findings supported by the record that, through medication and treatment, Ms. Mott's mental impairments could be significantly alleviated.

With no other reasons to question the ALJ's assessment, the court is obliged to conclude that the ALJ's decision was supported by substantial evidence. As such, the court will not remand the case for further consideration.

Accordingly,

**IT IS ORDERED** that the decision of the Commissioner denying the plaintiff's application for disability insurance benefits and supplemental security income be and the same is hereby **AFFIRMED**;

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED**.

Case 2:09-cv-00784-JPS   Filed 07/08/10   Page 31 of 32   Document 23

The clerk of the court is ordered to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 8th day of July, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge